**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NICOLE GOULET, ANDREW GOULET | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO.  25-2852 |
| | : | |
| NATIONWIDE INSURANCE | : | |
| COMPANY OF AMERICA | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                              **July 20, 2026**

This is an insurance dispute between homeowners and their insurer over the scope of a

homeowner policy.  A fire broke out at the homeowners' residence, resulting in damage to part

of the exterior siding.  Everyone agrees that the policy covers the cost of replacing or repairing

the fire-damaged siding.  But they disagree as to whether the policy also covers replacing the rest

of the siding, which no longer matches the new, replacement siding.  The insurer denied

coverage, asserting that the policy only covers the cost of replacing the fire-damaged siding.  The

homeowners sued, and now the insurer moves for summary judgment based on its reading of the

policy.  For the reasons explained below, we agree with the insurer's reading and conclude that

the policy clearly and unambiguously does not cover the replacement of the old siding.  Under

that reading, no material disputes of fact remain and we grant summary judgment in the insurer's

favor.

## I.      FACTUAL BACKGROUND

On January 22, 2025, a fire at the residence owned by plaintiffs Nicole and Andrew

Goulet caused damage to the home's aluminum siding, specifically on the rear elevation of the

residence's bump out section.  DI 27 at ¶¶ 1-3.  Plaintiffs' home was insured under a

Homeowner Policy (the Policy) issued by defendant Nationwide Insurance Company of America

(Nationwide), known as an "all-risks" policy.  *Id.* at ¶¶ 4-5.  The Policy provides coverage for

risks of loss that are not specifically excluded under the Policy.  *Id.* at ¶ 5.  In a section titled,

"PERILS INSURED AGAINST[,]" the Policy states:

### SECTION I — PERILS INSURED AGAINST

### A. Coverage A — Dwelling And Coverage B — Other Structures

> **1.** We insure against direct physical loss to property described in Coverages A and B.
>
> **2.** We do not insure, however, for loss:
> . . .
> **c.** Caused by:
> . . .
> **(6)** Any of the following:
> . . .
> **(k)** Mismatch of color between undamaged material and new material used to replace old, weathered or oxidized damaged material; or
>
> **(l)** Mismatch between undamaged material and new material used to repair or replace damaged material due to outdated, obsolete or discontinued products.

DI 19-5 at 27-29.  The Policy includes a separate section titled, "EXCLUSIONS[,]" which states:

"We do not insure for loss caused directly or indirectly by any of the following. Such loss is

excluded regardless of any other cause or event contributing concurrently or in any sequence to

the loss. These exclusions apply whether or not the loss event results in widespread damage or

affects a substantial area."  *Id.* at 31.  The Policy also contains a section titled,

"CONDITIONS[,]" which governs the settlement of "[c]overed property losses" including costs

for loss to dwellings.  *Id.* at 34-36.  This provision states:

> **a.** We will pay the cost to repair or replace, after application of deductible and

without deduction for depreciation, but not more than the least of the following amounts:

> **(1)** The limit of liability under this policy that applies to the building;
>
> **(2)** The replacement cost of that part of the building damaged for like construction and use on the same premises; or
>
> **(3)** The necessary amount actually spent to repair or replace the damaged building. If the building is rebuilt at a new premises, the cost described in **(2)** above is limited to the cost which would have been incurred if the building had been built at the original premises.

*Id.* at 36.

Plaintiffs provided Nationwide with an estimate to replace the entirety of the siding on the dwelling, in the amount of $81,276, and submitted a claim demanding such payment.  DI 27 at ¶¶ 9-10; DI 26 at ¶ 22.  They obtained a report from Itel Laboratories, Inc. (Itel), which provided a report on the dwelling's siding material.  DI 19-5 at 194-95.  The report concluded that the damaged siding material had "features that are unique to a product[s] that are no longer available" and that "[p]roducts manufactured with these specifications are no longer available." *Id.*  Accordingly, it determined that the damaged siding material "is discontinued" and that a national search revealed "no similar matches[.]"  *Id.* at 195.  At Nationwide's request, a property restoration company called Puro-Tec inspected the siding and issued a report in which, upon reviewing the ITEL report, Puro-Tec concluded that "there are like, kind, and quality (LKQ) aluminum siding products currently available that can be used to replace the entire affected elevation" that "are compatible with the existing exterior cladding accessories and trim" — noting two specific products.  *Id.* at 157-60.  The report also stated that "[w]ith appropriate detailing and alignment, the repaired area will maintain a consistent and professional appearance without necessitating full replacement of undamaged elevations" and that "the new siding may

be painted to match the existing [siding]" to address any "color matching concerns." *Id.* at 158.

Nationwide issued a partial denial of coverage in which it denied the claim for siding that was not damaged by the fire based on its assertion that the Policy did not provide coverage for the mismatch between (1) the color of the undamaged material and new material used to replace or repair old, weathered, or oxidized damaged material; or (2) the undamaged material and new material used to replace or repair damaged material due to obsolete, outdated, or discontinued products. DI 27 at ¶ 14; DI 19-5 at 153-55. As such, it only paid for the cost of replacing the entire elevation where the damaged siding was located, which included portions of the elevation that were undamaged — issuing a payment of $1,936.75. DI 27 at ¶¶ 11-13. It then issued a revised estimate to repair the siding using materials that the Puro-Tec report identified and issued a supplemental payment to plaintiffs of $398.80. *Id.* at ¶¶ 16-17.

Plaintiffs then sued Nationwide, asserting breach of contract and bad faith claims. DI 1-4 at 6-10. Nationwide removed this action to federal court on June 3, 2025. DI 1. The parties filed cross motions for summary judgment in February of 2026, which we denied without prejudice due to the parties' failure to follow our policies and procedures on summary judgment motions. DI 16. Now, Nationwide again moves for summary judgment, while plaintiffs purport to seek summary judgment (without filing a motion to do so) in their response in opposition. DI 19; DI 26.

## II.    MOTION AT ISSUE

Nationwide seeks summary judgment, asserting that there is no genuine fact in dispute and that it is entitled to judgment as a matter of law. DI 19; DI 20. It argues that plaintiffs have not established that their claim for the entirety of the dwelling's siding is covered by

Nationwide's Policy, and that there is no factual dispute that the siding included in that claim was not damaged by the fire. DI 20 at 9-23. According to Nationwide, the Policy clearly does not insure for loss that results from the mismatch of color between undamaged and new material upon replacing old, weathered, or oxidized damaged material, or the mismatch between undamaged material and new material used to replace or repair damaged material because of outdated, obsolete, or discontinued products. *Id.* at 10. Such mismatches are not covered by the Policy, Nationwide insists; this is not a matter of a policy exclusion. DI 20 at 10-11; DI 27 at 4. And even if we read the anti-matching provision as an exclusion, Nationwide insists that this exclusion may be applied to a covered loss and must be read alongside the Loss Settlement provision, which requires payment for the part of the building that was damaged. DI 27 at 4. Nationwide also emphasizes that the Policy pays only the replacement cost of the dwelling's damaged parts — which here is the rear bump out. DI 20 at 11. It compares plaintiff's case to *Grote v. Am. Econ. Ins. Co.*, 2025 WL 364068 (E.D. Pa. Jan. 30, 2025),[1] *Pellegrino v. State Farm Fire & Cas. Co.*, 2013 WL 3878591 (E.D. Pa. July 29, 2013), *aff'd*, 568 F. App'x 129 (3d

---

[1] In *Grote*, the parties disputed whether the policy covered replacement siding for the entire dwelling or only the damaged portions thereof. *Id.* at *1. The policy stated that it covered "accidental direct physical loss" to the dwelling, except as excluded, and that losses under that coverage were settled at "replacement cost" where "replacement cost" constituted "the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for appreciation." *Id.* It also stated that it would "not pay for the cost to replace and/or match any undamaged siding, roof surfacing and/or windows due to any mismatch between the existing undamaged siding, roof surfacing and/or windows on a covered dwelling . . . and any new materials used to repair or replace the damaged siding, roof and/or windows on a covered dwelling . . . because of . . . obsolescence or unavailability of materials." *Id.* (citation modified). The District Court held that the policy's language was clear and unambiguous, concluding that the policy, in light of the anti-matching exclusion, did not cover replacement siding on the dwelling's undamaged portions regardless of whether the replacement materials were "of like kind and quality or equivalent construction." *Id.* at *4 (citation modified).

Cir. 2014),[2] and *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178 (Pa. Super. 2007).[3]  DI 20

at 12-17.  Nationwide contends that the Puro-Tec report identified siding materials that were

"substantially similar in function, shape, size, dimensions and compatibility to those pieces of

siding that were damaged" and therefore met the Policy's requirement regarding payment for

like kind and quality materials to replace the damaged siding.  *Id.* at 18.  Nor, Nationwide argues,

does its payment to replace the undamaged portions of the rear bump out indicate that it was

---

[2] In *Pellegrino*, the parties agreed that a portion of the plaintiffs' home's siding and roof suffered storm damage that constituted a covered loss under the home insurance policy, but the plaintiffs argued that the policy entitled them to the cash value of both the damaged and undamaged portions of the siding and roof because the insurer determined it could not replace the damaged property with "similar construction." *Pellegrino v. State Farm Fire & Cas. Co.*, 2013 WL 3878591, *1 (E.D. Pa. 2013).  The District Court determined that the policy provisions in question were unambiguous and clearly stated that the insurer would "pay the cost to repair or replace with similar construction . . . the damaged part of the property" and that, until the completion of replacement or actual repair, the insurer would "pay only the actual cash value at the time of the loss of the damaged part of the property." *Id.* at *4 (citation omitted).  It held that this language meant that the insurer was only contractually obligated to make an actual cash value payment for the damaged property.  *Id.*  The Court analogized the case before it to *Greene*. *Id.* at *5.

[3] In *Greene*, the Superior Court addressed whether an insurance policy covered replacement of the dwelling's entire roof when part of the roof was damaged due to a covered loss because matching shingles were unobtainable and the policy provided for "replacement of that part of the building damaged" and "like construction and use." *Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1181 (Pa. Super. 2007).  The policy included a replacement cost provision which stated that it would pay the cost to replace or repair but no more than "(1) the limit of liability under this policy that applies to the building; (2) the replacement cost of that part of the building damaged; or (3) the necessary amount actually spent to repair or replace the damaged building." *Id.* at 1186.  It further stated that "[t]he replacement cost will not exceed that necessary for the like construction and use on the same premises; regardless of whether the replacement building is located on the same or different premises." *Id.*  The Court concluded that the policy clearly and unambiguously required the insurer to pay the replacement cost of the damaged part of the building, finding plaintiffs' argument that the policy required payment for the cost of replacing the entire roof was absurd and unreasonable because that interpretation would require the insurer to replace all siding when one piece of siding was damaged or an entire door when the doorknob was damaged. *Id.* (citation omitted).

obligated to replace the undamaged material across the entire dwelling.  DI 27 at 7.

Nationwide also asserts that it is entitled to summary judgment in its favor on plaintiffs' bad faith claim.  DI 20 at 18-23.  It avers that it handled and paid plaintiffs' claim reasonably, as indicated by case law addressing similar policy provisions and its coverage of the replacement of the entire rear bump out, which included undamaged portions of the siding.  *Id.* at 20-23. Nationwide also highlights that the mismatching provision and the Loss Settlement provision — which required Nationwide only to pay for the damaged siding — both justified Nationwide's denial of plaintiffs' claim to replace all the undamaged siding.  *Id.* at 21.  And, Nationwide urges, plaintiffs' characterization of their argument as novel indicates that Nationwide's interpretation of the contract was reasonable, rather than in bad faith.  DI 27 at 7-8.  Nationwide also highlights the lack of case law cited by plaintiffs in support of their "novel" argument.  *Id.* at 8.  Thus, Nationwide maintains, plaintiffs' bad faith claim must fail as a matter of law.  DI 20 at 22-23.

Plaintiffs oppose Nationwide's summary judgment motion and (without filing a cross motion for summary judgment) assert that they are entitled to summary judgment on the breach of contract claim.  DI 26 at 10.  They read the Policy as covering direct physical losses to the dwelling caused by fire; in their view, this coverage is the only thing that matters, and we need not consider the exclusion for losses caused by mismatches of color or material between undamaged and new material used for a repair because that provision pertains to exclusions, rather than a coverage limitation.  *Id.* at 8, 12-13.  Plaintiffs characterize this as a novel argument.  *Id.* at 15.  In their view, their claim is covered because the request for the replacement of all the siding was part of the repairs for the covered loss from the fire.  *Id.* at 13.  Nationwide's payment to replace the undamaged materials for the entire rear bump out, plaintiffs maintain,

indicates that Nationwide knew it was responsible for covering the entirety of the siding on the dwelling and that the materials on the market differed from those on plaintiffs' home when the loss occurred. *Id.* at 14, 16. Plaintiffs assert that the Policy provides coverage for all damages so that the damaged siding could be repaired and replaced and the dwelling could be returned to its pre-fire condition, in which all siding matched. *Id.* at 8. They argue that the Policy required Nationwide to pay for the replacement of undamaged siding material to match the materials used to repair the damage because the market lacked materials that would satisfy the Policy's Loss Settlement provision. *Id.* at 11, 14-15.

Plaintiffs also contend that there is a material disputed fact regarding their bad faith claim: Nationwide's intent respecting its denial of plaintiffs' claim, which plaintiffs' claim was unreasonable. *Id.* at 10, 18. They insist that they described the basis for their bad faith claim in their complaint and that Nationwide's continued refusal to fully cover the claim, and filing of this summary judgment motion, constitutes "an intentional continuation of its own incorrect conduct" that rises to the level of bad faith. *Id.* at 18-19.

## III.    LEGAL STANDARDS

### A.    Summary judgment

Summary judgment is warranted when the movant demonstrates "that there is no genuine dispute as to any material fact" such that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021) (citation omitted). Upon evaluating a summary judgment motion, we must "view the record and draw inferences in a light most favorable to the non-moving party." *In re IKON Off.*

8

*Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citation omitted).  And we shall assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.    Insurance claims**

In insurance coverage disputes, the insured typically bears the initial burden of making a prima facie showing that a claim falls within the policy's coverage.  *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009).  If the insured meets this burden, then the insurer must demonstrate that the policy exclusion excuses it from providing coverage if the insurer asserts that coverage applies.  *Id.* (citation omitted).  We first examine the policy's terms when interpreting an insurance policy.  *Nationwide Mut. Ins. Co. v. CPB Intern., Inc.*, 562 F.3d 591, 595 (3d Cir. 2009).  Our goal is to determine the parties' intent; to do so, "we will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision."  *401 Fourth St., Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005).

Under Pennsylvania law, the court generally determines whether an insurance contract covers a given claim.  *Gardner v. State Farm Fire & Cas. Co.*, 544 F.3d 553, 558 (3d Cir. 2008) (citation omitted).  We narrowly construe insurance policy exclusions in favor of coverage.  *Mut. Benefit Ins. Co. v. Politsopoulos*, 115 A.3d 844, 852 n.6 (Pa. 2015) (citation omitted).  "Words of common usage in an insurance policy are to be construed in their natural, plain, and ordinary sense, and we may inform our understanding of these terms by considering their dictionary definitions."  *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999) (citation modified) (citations omitted).  When the language of the policy is unambiguous and clear, we must give effect to that language.  *Gardner*, 544 F.3d at 558 (citation omitted).  But

9

where the policy's language is ambiguous, we must construe the provision in favor of the insured and against the insurer (as the drafter of the policy). *Id.* (citation omitted); *see also 401 Fourth St.*, 879 A.2d at 171. "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Gardner*, 544 F.3d at 558 (citation modified) (citation omitted). "[T]he focus of any inquiry regarding issues of coverage under an insurance policy is the reasonable expectations of the insured" but "[a]n insured . . . may not complain that its reasonable expectations have been frustrated when the applicable policy limitations are clear and unambiguous." *Frederick Mut. Ins. Co. v. Hall*, 752 Fed. Appx. 115, 117 (3d Cir. 2018) (citation omitted).

An insured also may bring a bad faith claim against an insurer based on the denial of coverage under an insurance policy. According to Black's Law Dictionary, bad faith in the insurance context constitutes "[a]n insurer's blatantly unfair conduct" — specifically their "unreasonable and unfounded (though not necessarily fraudulent or malicious) refusal to provide coverage for, to investigate, or to settle a claim" which typically requires demonstrating "that the insurer knew or should have known that it was acting unreasonably or recklessly disregarded the risk." *Bad Faith*, BLACK'S LAW DICTIONARY (12th ed. 2024). To prevail on a bad faith claim, the insured must demonstrate that the insurer (1) lacked a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded the fact that it lacked a reasonable basis for denying the claim. *Northwestern Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 137 (3d Cir. 2005) (citation omitted). "[M]ere negligence or bad judgment is not bad faith" and the insured must demonstrate that "the insurer breached its duty of good faith through some motive of self-interest or ill will." *Id.* (citation omitted). The insured must prove the insurer acted in bad faith

by clear and convincing evidence. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 750 (3d Cir. 1994). In opposing summary judgment, the insured carries a "commensurately high" burden because we "must view the evidence presented in light of the substantive evidentiary burden at trial." *Northwestern*, 430 F.3d at 137 (citation omitted). To defeat a bad faith claim, the insurer must provide evidence of a reasonable basis for its action or inaction. *Gibson v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 182, 191 (3d Cir. 2021) (citation omitted). Additionally, a party may not "maintain an implied duty of good faith claim where the allegations of bad faith are identical to a claim for relief under an established cause of action." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 92 (3d Cir. 2000) (citation modified) (citations omitted). In other words, if the contractual bad faith claim is identical to the breach of contract claim for the denial of coverage, the bad faith claim will not stand. *Durkin v. State Farm Mut. Auto. Ins. Co.*, No. 25-1399, 2026 U.S. App. LEXIS 1701, *6 (3d Cir. Jan. 23, 2026) (non-precedential) (citing *Northview*, 227 F.3d at 91-92).

## IV. DISCUSSION

### A. We grant summary judgment in Nationwide's favor on the breach of contract claim because the Policy clearly and unambiguously does not cover plaintiffs' claim for the replacement of the undamaged siding

Nationwide is entitled to summary judgment on the breach of contract claim because there is no genuine dispute of material fact relevant to this claim and, as a matter of law, the Policy does not cover the cost of replacing plaintiffs' undamaged siding. As we must when evaluating an insurance dispute, we begin with the insurance policy's terms, *Nationwide*, 562 F.3d at 595, examining the entirety of the applicable provision, *401 Fourth*, 879 A.2d at 171. The first provision at issue states, under a subsection titled "Coverage A — Dwelling And

11

Coverage B — Other Structures[,]" that Nationwide "insure[s] against direct physical loss to property described in Coverages A and B." DI 19-5 at 27. Though the Policy does not define "direct physical loss[,]" the context of the Policy, the parties' representations, and dictionary definitions make clear that this refers to tangible damage to plaintiffs' property. DI 19-5 at 81; *Direct*, Merriam-Webster (12th ed. 2026); *Physical*, Merriam-Webster (12th ed. 2026); *Loss*, Merriam-Webster (12th ed. 2026). The parties do not dispute that the damage to the aluminum siding of plaintiff's property caused by the fire constituted a covered loss under the Policy. DI 27 at ¶¶ 22-23. And the parties do not dispute that other portions of the siding were not damaged by the fire. DI 27 at ¶¶ 2-3.

The Policy then states, in the same section, "We do not insure, however, for loss . . . [c]aused by . . . "[m]ismatch of color between undamaged material and new material used to replace old, weathered or oxidized damaged material; or . . . [m]ismatch between undamaged material and new material used to repair or replace damaged material due to outdated, obsolete or discontinued products." DI 19-5 at 27-29. Again, the Policy does not define these terms, but based on our understanding of these terms "in their natural, plain, and ordinary sense[,]" *Madison*, 735 A.2d at 108, and the parties' representations, we find that this provision means that Nationwide does not cover harm to property that results from the undamaged (old) material and new replacement/repair material not looking the same — including when this "mismatch" results because the old material is no longer available on the market. DI 19-5 at 89, 92, 153. At least with respect to the parties' dispute in this case, the Policy language is clear and unambiguous. Plaintiffs do not seriously disagree; rather, they argue that the loss (the lack of a match between the old, undamaged material and the new replacement material) was not "caused by" the

12

mismatch between those materials, but that it rather was caused by the fire itself. DI 26 at 8, 12-13. Essentially, plaintiffs suggest that if a covered event (like a fire) causes damage to part of their home's siding, it necessarily damages the entirety of the home's siding if the material used to replace the damaged siding does not match the undamaged siding — even though plaintiffs concede that portions of the siding were burned, melted, or otherwise directly damaged by the fire. DI 27 at ¶¶ 2-3.

Plaintiffs' proposal is one of those ideas that sounds plausible in a vacuum but cannot be sustained when read alongside the rest of the Policy. We therefore reach a conclusion similar to those reached by the courts in *Grote*, *Pellegrino*, and *Greene*, cases in which the policy at issue contained similar replacement cost language. In those cases, and in light of that limiting language, the courts found that the policy only covered the cost of repairing or replacing the damaged part of the property (rather than the entirety of the roof or siding). *See Grote*, 2025 WL 364068 at *1, *4; *Pellegrino*, 2013 WL 3878591 at *1, *4-*5; *Greene*, 936 A.2d at 1186. We agree. Indeed, as the *Greene* Court emphasized, plaintiffs' interpretation of the Policy would lead to the absurd result of requiring Nationwide to replace all siding when one piece of siding was damaged by a covered event, simply because the replacement of that piece of siding with new material resulted in a mismatch between that piece and the undamaged siding. *Greene*, 936 A.2d at 1186. That is not a reasonable reading of the Policy, particularly given the anti-matching and Loss Settlement provisions.[4] Nationwide is entitled to summary judgment on the breach of

---

[4] The Loss Settlement provision states that "[b]uildings under Coverage A or B" are settled "at replacement cost without deduction for depreciation" and that Nationwide will pay (a) no more than the least of the (1) liability limit under the Policy applicable to the building, (2) replacement cost of the part of the building damaged for like construction and use on that

13

contract claim.

**B.    Nationwide is entitled to summary judgment on plaintiffs' bad faith claim because plaintiffs have not demonstrated that Nationwide acted unreasonably or recklessly in denying coverage for plaintiffs' undamaged siding**

Because we find that the Policy clearly and unambiguously does not cover the cost of replacing plaintiffs' undamaged siding, we also find that plaintiffs' bad faith claim fails as a matter of law. The Policy clearly does not cover the replacement of plaintiffs' undamaged siding, so it was neither unreasonable nor reckless for Nationwide to deny coverage thereof on this basis. *Northwestern*, 430 F.3d at 137. Nationwide's interpretation of the Policy as not covering such replacement costs constitutes evidence of its reasonable basis for partially denying plaintiffs' claim. *Gibson*, 994 F.3d at 191. And plaintiffs have not carried their burden of demonstrating by clear and convincing evidence that Nationwide acted in bad faith when it rendered this partial denial: plaintiffs' sole argument is that they have a different interpretation of the Policy than Nationwide, that Nationwide's interpretation constitutes a misrepresentation of their claim and the Policy, and that Nationwide's continued assertion of its interpretation in this litigation constitutes bad faith. DI 26 at 18-19. That is not evidence (let alone clear and convincing evidence) of bad faith. Nor do we consider Nationwide's payment to replace the entire rear bump out, including the undamaged portions thereof, indicative of its bad faith in

---

premises, or (3) the necessary amount spent to replace or repair the damaged building; and (b) no more than the actual cash value of the damage until replacement or repair is complete, unless such cost is less than 5% of the amount of insurance in the Policy on the building and below $2,500. DI 19-5 at 35-36. This provision focuses on the cost of repairing or replacing damaged material and limits the Policy's coverage according to that cost (or less than that cost). The provisions providing coverage for direct physical loss to property (i.e., tangible property damage) are not compatible with covering losses caused by a mismatch between undamaged material and new material used to replace damaged material when that mismatch results from the discontinuation of the old material.

14

denying plaintiffs' request to pay for the replacement of the dwelling's entire siding.

Accordingly, Nationwide is entitled to summary judgment on plaintiffs' bad faith claim.

## V.    CONCLUSION

No genuine issues of material fact remain in this matter.  And, as a matter of law,

Nationwide is entitled to judgment in its favor because the Policy clearly and unambiguously

does not cover the cost of replacing plaintiffs' undamaged siding.  Because Nationwide's

interpretation of the Policy is correct, Nationwide also is entitled to judgment in its favor on

plaintiffs' bad faith claim.  Accordingly, Nationwide's motion for summary judgment is granted

on all claims against it.  An appropriate order accompanies this memorandum.